argument in Allen versus Antal at all. Good morning, Mr K. Morning owners. Mayor Katz on behalf of Keegan Ellen. The attorney defendants in this case all argued that notwithstanding their very, very remarkable malpractice in the case of the county defendants, we're talking about representing my client and doing absolutely nothing for 856 days. While he sat in prison, he completed his entire three and a half year prison term. It did nothing. They sent him a single letter and in Atwell's case, he represented my client effectively. He did a very good job reversing the conviction before the appellate division, but then did nothing. Then didn't inform him despite knowing it was, excuse me, despite thinking at the time that my client was still in prison. We know that because he sent him a letter to his prison address, which was returned. Yeah, as far as my, again, as far as he knew, my client was still sitting there in prison, did nothing to inform him, did nothing to let him know that his conviction had been reversed, that he was a free man. They say this, that they say that they're excused from malpractice. Malpractice is excused because my client is not, quote, actually innocent of the underlying offense.  and I can explain why if the court wishes in a moment, but more importantly, the actual innocence has nothing to do with this case. It's completely irrelevant. It is a doctrine completely inapposite over here. What's the jurisdiction of the district court or the federal courts with respect to the claim that you are bringing, your client is bringing, you're bringing on his behalf for malpractice, attorney malpractice? It's diversity jurisdiction, if I remember correctly. I'm not 100% certain, but I can get the complaint. Well, Mr. Allen's a resident of New York, right? I don't think so. Okay. You can answer on that on rebuttal. Didn't get that, but go ahead. So they assert actual innocence. Actual innocence is inapposite. As I said, the Carmel case makes very clear that the issue and issue with everything with regard to actual innocence, it is a matter of public policy that a criminal convict cannot assert his innocence, that being an element of the claim, of the malpractice claim. So where the criminal convict is still a convict, either because he pled guilty, which is most of the cases that this comes up, or because his conviction still stands for other reasons, he can't then go back and sue his attorneys for malpractice. Here, the conviction was reversed. It was reversed before this action was initiated. And so therefore, actual innocence is completely irrelevant. It's not part of the discussion whatsoever. With regard to Atwell, it's an even easier issue than malpractice happened after the conviction was reversed. It's entirely distinct, unrelated to the client's, to my client's guilt, or not, of the underlying crime. Moving on from the actual innocence point, the appellate division reversed the conviction, dismissed the indictment on November 1st of 2011. According to Dutchess County, that's when the malpractice claim against the Defender's Office began to run. Do you want to address their arguments? Sure. Under state law, in New York state law, a claim does not accrue until it's enforceable in court. And these claims were not enforceable in court, certainly before the appellate division's decision came down, but even after that, because of abstention reasons. Really beyond that, with regard to malpractice, it's even, our argument's even stronger, because you still have the actual innocence issues. Until the, certainly until the People's Appeal ended, the appeal to the Court of Appeals ended, with the Court of Appeals dismissal of that appeal, which was on August 8th, 2012. There was still, there was still an outstanding conviction. I mean, it had been reversed, but there was still the, always the possibility that the Court of Appeals could reinstate it. There was an indictment still standing. So there was always the possibility of further prosecution. And the Britt case makes very clear that as long as that's an option, as long as that's a possibility, that the underlying offenses in the indictment can result in further prosecution, the claim doesn't accrue. That's what Britt holds. That is the holding of Britt. With regard to the other claims, the other state law claims, with regard to all of the defendants where this is an issue, the claims don't accrue until enforceable. That's New York state law, different from federal law. It has to be enforceable in court. You have, the plaintiff has to have the ability to go into court and say, here are my claims and they are viable. That doesn't happen for all of the state law claims, at least until August 8th, 2012, and probably until the indictment was dismissed, August 30th, 2012. Because until that happened, none of the state law claims were enforceable. Most of them rest either on the wrongfulness of the conviction or, more fundamentally, the wrongfulness of the initial stop that led to all of this for a violation of the vehicle traffic law. Wasn't the error that was made made on the part of the office of the county clerk and not on the part of Atwell? Well, there were two errors. There were two proximate causers here, if that's a word. And that's not a problem. I mean, the case law, hundreds of years old, is very clear that you can have two different sets of proximate causation. The only issue with regard to proximate causation is whether or not it was reasonably foreseeable. I'm quoting now the Zahari case, which is a 1983 case, but it's codifying, it's restating common law. Reasonably foreseeable intervening forces. If the intervening forces are reasonably foreseeable. Now, okay. Was it reasonably foreseeable to Atwell that the clerk would fail to forward the information about the dismissal of the indictment? No, and that's why I stopped myself. The cases make clear in this context, and it's the wrong quote, but the cases make clear in this context that the issue is not whether or not the specifics, the specific mechanism by which the injury occurred was foreseeable. The issue is whether or not the injury was foreseeable. And when you have a client, a criminal defendant, who's possibly sitting in jail, and you don't inform him that his conviction is reversed, certainly he's on parole if he's not in jail. It is reasonably foreseeable that the result of not telling him is going to result in a further deprivation of liberty. The mechanism he couldn't have foreseen. We concede that. But the injury was certainly foreseeable. And that's enough. The case law makes this quite clear. Do you want to address any of the other issues that you've raised in the briefs? There are a lot of issues in this case, and there's a deal. We're aware of that. So I just... If there are no further questions, I suppose I'll... Can I reserve additional time for rebuttal, or I've already reserved three minutes? We'll give you another minute for rebuttal. You want to give that to me, so you still have that minute? One issue I think is worth discussing. With regard to the county's liability for malpractice, we discussed the rules of professional conduct and used that as a source to identify... Essentially, an attorney has to be diligent. And waiting 856 days is not diligent by definition. They said correctly that you can't use the rules of professional conduct as a cause of action. And I just want to address that very quickly. We're not doing that. We're using the rules of professional conduct, and actually those are simply codifying the common law, that an attorney has to be reasonably diligent. That's not really disputable, and that's been true forever, as far as I know. We're using that as evidence of the standard of care, the standard of practice. And certainly, the case law is clear on this as well. You're certainly allowed to use that as evidence of the standard of practice. Not that I think we need it. I think that everyone understands, even non-attorneys, that an attorney can't sit on a criminal case for 856 days and say that's okay, even if we're too busy. An attorney just can't take the case in that instance. But in any event, that's what we're using it for, and I think it's certainly viable for that purpose. If there are no further questions? Thanks, Mr. Katz. And we'll give you four minutes for rebuttal. Mr. Grieco. Good morning. Good morning, Your Honors. Matthew Grieco from the State Attorney General's Office. I'm here on behalf of the State Trooper Defendants, Antal and Dorner. Nearly all of Mr. Allen's claims against the troopers are time-barred because they accrued at the latest when he was arraigned a few hours after his arrest, in June 2007. This action was not filed until November 2012, beyond the three-year statute of limitations for a Section 23 claim brought in New York. As Mr. Allen himself concedes in his opening brief at page 17, his complaint does not plead any tortious acts by the troopers after the day of his arrest. Therefore, all of his federal claims could have been brought at any time after his arraignment, save for his malicious prosecution claim, which, of course, accrued when his conviction was overturned in 2011. And contrary to the claims in his brief, it is clear from the Supreme Court's decision in Wallace v. Cato that a claim is not told by a conviction unless the claim itself necessarily impugns the validity of that conviction. And malicious prosecution, his malicious prosecution claim is the only one that would in this case. So unless there are specific questions about any of the time-bar issues, I will just use my limited time to address the malicious prosecution claim. He fails to show three out of the four required elements of a malicious prosecution claim. He fails to show that trooper, fails to plead, I should say, that troopers Antal and Dorner played any role in initiating his prosecution beyond the arrest itself, either by filing a complaint or by pressuring a prosecutor to act. Second, he alleges no facts from which the court could even infer that he bore actual malice towards the State troopers. And third, they had probable cause because, which is established both by the fact of his guilty plea and because his complaint itself pleads the facts necessary to establish probable cause, given that he did in fact have a gun in the car and he had access to ammunition, which the definition of a loaded weapon for purposes of New York State law includes not just a gun that has a bullet in the chamber, but also a gun where there is ammunition in the possession of the same person. So there was probable cause to arrest him for criminal possession of a weapon of the second degree, which defeats his malicious prosecution claim and also his other claims in the event that they were timely. Unless the court has any questions, I will stop there. Mr. Atwell. Good morning, Your Honors. My name is Dale Atwell. I'm here pro se. The first question you asked of the appellant was how did the district court acquire jurisdiction? The answer is Connecticut. After he got out of jail, he moved to Connecticut. He says, this is despite the fact that he told the trial court, the appellate court, everyone else that he still lived in New York. So let's assume that his claim is true. Let's assume that he never received a copy of the appellate division order for whatever reason. Let's also assume that he's right, that somehow that's my fault. Does that matter? Well, the district court says no because there's no proximate cause. There's no proximate cause because there's no legal malpractice when alleged negligence is all you've got. And we know this as a matter of law because the New York State criminal procedure law says so with three statutes, 160-50, 470-45, 470-25. And in this case, the appellate division even put a specific directive order in its decision. So the link in the chain of probable cause between the alleged negligence and the alleged damages is broken. There's no probable cause, traceable causation back to myself. So the only way that alleged negligence can become probable cause of damages in this case is if there is no statutory law. Only if New York criminal procedure law doesn't exist. But it does exist. So his claim is necessarily premised on the notion that an appellate lawyer is ignorant of the appellate procedure law. We know that this law is in place. The New York State legislature has enacted statutes for us and we all use them in this court and in every court in the United States. I think his claim is premised on the proposition that you failed to notify your client that he had prevailed in the litigation. That's right. That's his claim. So let's assume he's right. At best, that's a... At the best, then the alleged negligence becomes negligence. And your claim, your argument, and I believe I understand it, is that that doesn't establish proximate cause. I think that's what the district court is saying, that even if... Were you in communication with your client before the appellate brief was filed? Or does the record reflect anything about that? I just didn't... Before the appellate brief was filed, no. The appellate brief was filed to his last known address, which was prison. That was returned from the prison. After that, the last known address we had was the address he left with the appellate court, with the trial courts, which was New Hyde Park, New York. But by the time the decision had come out, he moved to Connecticut. And I was supposed to know that. That's the claim. If I was somehow supposed to know that, or hire an investigator to look for him, or assume that his mail was never received, that's the negligence he's looking for. And even if that's right, that might work for a negligence case, but this isn't a negligence case. This is a legal malpractice case. So negligence alone is not enough. You've got to have the proximate cause. And the district court says the proximate cause comes from the statutes themselves, that they have to be effectuated. They're in place for the appellate court. They're in place for the trial court. And these people have to notify the division. I mean, the lack of proximate cause comes from the existence of the statutes and the requirements they impose on the other entities. I'm sorry, Judge, one more time. Proximate cause doesn't arise out of the statute. The absence of proximate cause vis-à-vis you arises out of the statute because it puts the onus on other entities or persons. Right. The statutes themselves have to be effectuated, of course, by court personnel, the appellate court clerk, the trial court clerk. They have to clear the rap sheet. A lawyer doesn't clear a rap sheet. If he wins this case, or if anyone wins this case, lawyers don't clear rap sheets. That's what the statutes are for. That's why the New York state legislator did it. And in this court as well, that's what happens. Lawyers don't clear rap sheets. We don't even have the authority to do it. No, we don't advocate to have that done if it is not being done. Well, the only way a person would know that it wasn't being done is if you get arrested again. That's the only way he ever found out. His second parole lawyer said, wait, let me check this out. The only way anyone would ever have known that or been unnoticed that that could have happened was if he got arrested again, which is the second proximate cause. He got arrested twice. So, at no time during your representation of the appellant, did you ever have any conversation with him about his case or his appeal? No, Judge. Was he done on papers, on the record below? It was all done in the brief force. It was a guilty plea case that was submitted. There was no oral argument. He was in prison upstate. I took this as a public defender case out on Long Island. I never visited him, no. I sent letters to his last known address, which was the prison, which is what was supplied by the appellate division. After he got out of jail, he moves to Connecticut. Right. Then the next address we have is his civilian address in Hyde Park, New York, but he wasn't there. So, as far as you know, he didn't know who was representing him on appeal. Was that a fair statement? I don't know what he was thinking, Judge. I quite frankly don't know. You certainly didn't advise him that you were representing him in effect because your mail to him was returned. My mail to him to the prison was returned. My mail to him to his civilian address was not returned. He says it's because he wasn't there. And I didn't send it certified. So, if I had the green card, we wouldn't be here. But every piece of mail I send... We might be here. That's true, Judge. We might still be here. Okay, the law I just talked about and the facts I just talked about are undisputed. And the District Court apparently feels as well. Judge, if there are any questions about the prosecuted cause issue, I'll entertain them now. As the second half is about actual innocence, and as to that issue, I'll rely on my brief and the brief written by the appellant. If there are any questions about actual innocence, I'll entertain them as well. Thank you very much. Thank you for your time. Excuse me, Mr. Posman. Thank you, Your Honors. I represent, as you know, the collection of Dutchess County defendants, both the public defenders and Mr. Kendall, the county clerk. I think the important issue for them goes to the first question Your Honor asked, and that is, when is the accrual date for the causes, state causes of action which I believe are the principal causes of action that he has filed against them, the malpractice as opposed for the attorneys and the common law negligence for the county clerk. And we believe that there is absolutely no doubt that for the public defenders, it absolutely accrued on November 1st, 2011 when the appellate division issued its order. That order was very clear. It ordered that the judgment of conviction be reversed. It ordered that the suppression motion be granted. It ordered that the indictment is dismissed. Important tense there. And it remitted the matter to the county court for one purpose only, to do the 160-50 evaluation and in its discretion decide if the record should be sealed. And under state law, CPL 475-20, the appellate division has the authority to issue that type of order on its own or direct someone else to do it. So it could have been remitted back to the county court judge to enter an order not inconsistent with our decision, etc., etc., the way appellate courts often phrase their decisions. But it didn't do that. It didn't do that. It specifically took the authority the legislature gave it and dismissed the indictment. There's another section of the CPL, the 160-50 sub 3A, which specifically says that a criminal prosecution terminates in the favor of the accused upon the dismissal of the indictment. And this law indictment was on November 1st by operation of the appellate division order. In this case, that's the accrual date for the cause of action because he was then free of the conviction, which is the prerequisite of a malpractice case that arises in a criminal matter. It's not when the negligence was committed, which is the civil malpractice, but in the criminal area, it's when you're free of the conviction. You're caught. You can state a claim in court. Now, as to Mr. Kendall, I mean, your adversary argues that the negligence had not taken place as of the date of the dismissal of the indictment. The negligence alleged against Kendall would be about two weeks later when he actually received it. That's the complaint alleges. He received it on November 16th. So for the purposes of our argument here, if we assume he had this obligation and that's when it would have accrued. Obviously, he couldn't, until he knew about it, he didn't accrue. But that makes no difference to the punchline here is the notice of claim was not filed for about nine or 10 months. We're not arguing over which day within that two-week window, whether it was November 1st or November 16th, 2011, when the notice of claim is filed in September 2012, it's well beyond the 90 days. The very significant thing is, of course, it's well within the year in 90 days. And the plaintiff still had the right under state law, as your honor, I'm sure I'm very familiar with, to make a motion to the Supreme Court for leave to file a late notice of claim, which would have ended all our problems. And as you know, the complaint alleges we filed a notice of claim, but we didn't have to. Specifically alleges that no notice of claim is necessary in the complaint. So I must say, I must say, when Mr. Katz says there's remarkable malpractice here by my client, I wonder what Mr. Keegan's attorney was doing in not filing an application for leave to file a late notice of claim, because he had all the facts at that time within nine months. So he had another nine months to make that motion. He didn't do that. Now, there's talk about the court of appeals action. Well, because there was an application to, um, for leave to appeal, which was ultimately granted, but then, of course, the appeal was never pursued. So while, and the argument is, well, while that was pending, the cause of action didn't accrue. Well, that's simply a misstatement, I believe, of the law. Mr. Allen could have commenced his action on November 2nd or any date after that. There was no stay issued by the court of appeals. So that appellate order was in place and enforceable. And the complaint alleges that, the complaint alleges that as of that date, Mr. Allen was free of the New York State penal jurisdiction and everything that happened to him after November 1st was wrongful. Every probation visit he went to was wrongful. The urine test he took was wrongful. His incarceration result was all wrongful. And all that happened while the court of appeals case was still pending. If the court of appeals had reinstated the indictment, in other words, reversed the appellate division, that simply would have provided the defendants with an affirmative defense to dismiss the case had one been filed timely. It doesn't have to do with the accrual of the cause of action. The subsequent action by the court of appeals, and it's important, reinstating a dismissed indictment, would have given my clients an affirmative defense that he can't sue for malpractice because he's still subject to the conviction. But it accrued on the 1st. If you look at the statutes, 47520, 16050, and of course, the most important thing, the language of the appellate order, it's, we urge, inescapable that under state law, this cause of action accrued on November 1st. He was free to file his notice of claim then, start his lawsuit 30 days thereafter, if no 50-H hearing had been held, or as soon as the 50-H hearing had been held, file his lawsuit. Thank you, Mr. Posner. Thank you. Okay. Mr. Katz, you reserve four minutes if you want to use all of the notes. See, I left my notes up here. I'm sorry about that. Thank you. I'll start first with the state defendants. Counsel said that his claims were not told by the conviction. He was quoting Wallace, the Supreme Court decision. That's true as a matter of federal law, except to the extent that state law provides a tolling provision. And we explained in our reply brief that CPLR 204 does that. Not on the face of the statute, but CPLR 204, as interpreted by case law, makes very clear that where a plaintiff does not have the ability to pursue his action in court, because he needs leave from a court to do so, which is the case here, because the federal court would have been preempted for sure, in face of the conviction, during the ongoing proceedings thereafter, during the entire course of the appeal leading up to the dismissal of the people's appeal in the Court of Appeals, he was preempted from doing so. CPLR 204 told his cause of action that entire period. Regarding malicious prosecution, we didn't allege actual malice. I think that that's wrong. Certainly, at least by inference, the malice was not disclosing the wrongfulness of the stop and the search and the seizure, presumably because the officers wanted to cover themselves. They didn't want discipline. And so they kept that private from, I'm assuming, and we don't know for sure, we haven't had discovery, but that's what it seems. They kept it private from the prosecutors. The prosecutors went ahead and filed charges and proceeded on the assumption that all the evidence was legitimately obtained, despite the fact that in the OLA, I think, 1960, the Court of Appeals decision regarding the vehicle traffic law statute that we're talking about here, which makes very clear that there is no violation of that statute unless the headlights cause an interference with the driver's operation of his vehicle. That didn't happen. All he did was squint, which it's quite obvious from that decision that squinting is not enough. With regard to the underlying offense that he pled guilty to, ultimately, my client is innocent. As he stated during his plea colloquy, he never admitted guilt, which is fascinating that that was considered a plea. Let me take you back a minute. Was it clear in the law at the time that the officers made the stop that squinting wasn't enough? Yes, the decision in the OLA makes very clear that what you have to do is cause an interference. No, no, no, no. Was it clear on the law at the time that the officers made the stop before the appellate division made their decision, which occurred a number of months later? I'm quoting the 1960 decision, which was the basis of the appellate division's decision. All right. And that 1960 decision makes very clear that there has to be an interference with the operation of the vehicle, not just that the driver doesn't like it. I mean, think about that. That would be a very strange rule. It'd be impossible for the driver to know what's going on. It's not strange for me. These darned LED lights just drive me nuts when I'm driving it. Those are extremely bright. They didn't have those in 1960. But anyway, in any event, that's what the decision holds, that there has to be an interference with the operation of the vehicle. My client was innocent of the underlying crime. He stated very clearly in his plea colloquy that the gun was located in his place of business. That was his law. There's no evidence that the officers knew that, right? No, that's a separate issue. But what counsel was saying was that... Well, that's a defense. I mean, you're saying, well, they shouldn't have even been bothering him about the gun because he was keeping it in his place of business and there's a statutory exception. No, no, that's not our argument, Your Honor. The argument with regard to immunity and those other issues that we were discussing about a second ago was that there was no violation of the vehicle traffic law. There was no basis to stop my client. There was no basis to force him out of his car for a minor traffic violation. That's absurd. That's absurd. To force him out of the car? He should have gotten a ticket and gone on his way. They forced him out of his car. They canvassed his vehicle. They claimed to have seen a handle of a gun. A handle. They didn't know if it was a sword, a prop, a fake gun. They didn't know what it was. They saw a handle of a gun, assumed it was a gun, assumed it was unlicensed. They didn't know it wasn't licensed. It turned out that it wasn't, but they didn't know that. And based on that, they did all of the arrests. That's with regard to the immunity issue. I'm not talking about his guilt, which was an argument that counsel made that, without getting into the details, I see I'm out of time. I would like to, but his, I'm sorry? You finish up this thought and then we'll let you sit down. The place of business argument is that he had this defense. He never asserted, he never admitted to his guilt. He was innocent all along. With regard to the bullets, the bullets were in a locked glove compartment. I believe it was locked, far in front of him. He could not have possibly grabbed the gun from under the chair in his car and simultaneously reached the glove compartment. And while the statute says that loaded gun doesn't actually mean loaded, it means he has possession of both gun and bullets. But it's obvious that what that means, what the legislator was thinking about was a person has a gun in one hand and bullets in his pocket. That's good enough. That's considered loaded because he can very easily load it. That's not our, those are not our facts. Great. Thank you, Mr. Katz. Thank you, Your Honor. Thank you all. We'll reserve decision.